**Affirmed and Opinion filed October 24, 2013.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-12-00553-CR

---

**JARED LEVI COLEMAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 23rd District Court**
**Brazoria County, Texas**
**Trial Court Cause No. 66104**

---

## O P I N I O N

On appeal from his murder conviction, appellant Jared Levi Coleman challenges the trial court's denial of his motion to suppress statements he made to officers about the offense and the trial court's refusal to admit expert testimony regarding appellant's susceptibility to giving a false statement under police questioning. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant was charged by indictment with the first-degree felony offense of murder, to which he pleaded "not guilty." In the course of a murder investigation, appellant gave several recorded statements to investigating officers. Before trial, appellant filed a motion to suppress three of those statements. The trial court denied the motion. In the trial that followed the jury found appellant guilty of the charged offense. The trial court assessed punishment at thirty years' confinement.

## DENIAL OF MOTION TO SUPPRESS

In his first issue, appellant asserts the trial court erred in denying his motion to suppress. In the motion appellant challenged the admissibility of two non-custodial statements, one written statement and one video-recorded statement, both of which appellant gave to investigating officers on September 27, 2011 (collectively, the "September Statements"). In both statements appellant implicated himself in the charged offense. According to appellant, police coerced or induced the September Statements by an offer to "help" him or a promise of probation and no jail time in exchange for his confession.

Appellant also sought to suppress a video recording of a custodial statement he gave to investigators on October 7, 2011 (the "October Statement"), after he was indicted for the offense. In this video statement appellant referred to and recanted parts of the September Statements. Appellant does not challenge the voluntariness of the October Statement but instead asserts that it was inadmissible as the fruit of the allegedly improperly obtained September Statements.

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). At a suppression hearing, the trial court is the sole finder of fact and is free to believe or disbelieve any or all of the evidence presented. *Wiede v. State*, 214

2

S.W.3d 17, 24–25 (Tex. Crim. App. 2007). We give almost total deference to the trial court's determination of historical facts, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89. We afford the same amount of deference to the trial court's application of the law to facts if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Id.* We review de novo the trial court's application of the law to facts if resolution of those ultimate questions does not turn on an evaluation of credibility and demeanor. *Id.*

The record of the suppression hearing reflects that appellant's friend had contacted an investigating officer with information indicating that appellant had confided in the friend about appellant's role in the charged offense. The friend contacted the officer the following day, indicating that appellant wanted to speak with the officer. The friend testified at the suppression hearing that in exchange for appellant's statements, the officer promised that appellant would receive only probation and not confinement. The officer denied imparting any such information to the friend or to appellant. The friend was present when appellant made the September Statements. The record indicates that the friend brought appellant to the police interview on the day of the September Statements, and in the friend's presence, the officer conducted a recorded, non-custodial interview with appellant. During the interview, appellant also made a written statement, which he signed at the conclusion of the interview.

As reflected by the record, the officer initially informed appellant of the possibility of being indicted for the offense. Additionally, the officer told appellant that by giving the statement, appellant had a chance to help himself and that the officer was trying to help appellant, too. The officer explained several times to appellant that he was not under arrest and that he was free to leave with

his friend and end the interview at any point. The officer informed appellant that he would not be placed in jail that day; the video reflects that the officer and appellant shook hands to confirm that appellant would not be jailed that day. Appellant orally confessed his involvement in the charged offense. He also gave a written statement about his involvement. Several times in the course of the interview, appellant asked whether he would go to jail that day or the following day. The officer confirmed that appellant would not go to jail that day or the following day. The recorded video of the statement reflects that the friend asked the officer whether appellant would be going to jail in the future and inquired about the possibility of probation, to which the officer responded, "no." This inquiry occurred one hour into the interview, after appellant had admitted involvement in the offense. The officer testified that by his statement, "no," he meant that appellant would neither go to jail nor receive probation in the immediate future and that he did not know what was going to happen in the future. The video does not reflect any promise regarding probation or any reference to such a promise made by the officer. Only the friend made a reference to probation. The officer admitted that appellant was hesitant to sign the written statement, but testified that the hesitation was not a result of any threat, promise, or coercion on the officer's part. The officer denied promising appellant probation or promising that appellant would receive no jail time. The officer testified that he did not threaten, coerce, or promise appellant anything in exchange for the September Statements.

After the interview, appellant left with his friend. The following day, appellant contacted the officer and informed him that the statements he had made in the interview the day before were false. On October 6, 2011, appellant was indicted and arrested. On the next day, appellant gave the October Statement to

4

the investigating officer, in which appellant also made reference to and recanted the September Statements. This recorded statement does not contain any reference to a promise of probation.

After hearing the evidence, the trial court denied the motion to suppress, finding, in pertinent part, that: (1) no promise or offer of probation or anything else of value was made by the investigating officer; (2) appellant never mentioned being promised probation from the officer or anyone else during either of his recorded interviews; and (3) the oral and written statements given by appellant were made freely and voluntarily and without compulsion or persuasion.

Article 38.21 of the Texas Code of Criminal Procedure, entitled "Statement," requires a statement to have been "freely and voluntarily made without compulsion or persuasion" to be admissible as evidence. Tex. Code Crim. Proc. Ann art. 38.21 (West 2005). In assessing the voluntariness of a statement, we consider the totality of the circumstances under which the statement was made, and ultimately whether appellant's will was overborne. *See Creager v. State*, 952 S.W.2d 852, 855 (Tex. Crim. App. 1997); *Reed v. State*, 59 S.W.3d 278, 281 (Tex. App.—Fort Worth 2001, pet. ref'd). A statement is involuntary if circumstances show that the confession was induced by a promise of a benefit. *See Ramirez v. State*, 76 S.W.3d 121, 126–127 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd).

For a promise to render a confession invalid under article 38.21, the promise must have been positive, made or sanctioned by someone in authority, and of such an influential nature that it would cause a defendant to speak untruthfully. *Martinez v. State*, 127 S.W.3d 792, 794 (Tex. Crim. App. 2004). The truth or falsity of the statement is immaterial; the question is whether the promise likely would induce a false confession. *Id.* at 794–95. General, unspecific offers to help are not likely to induce one to make an untruthful statement and will not invalidate

5

a confession. *Dykes v. State*, 657 S.W.2d 796, 797 (Tex. Crim. App. 1983). Similarly, general statements made to a suspect regarding how a confession can sometimes result in leniency do not render a confession involuntary. *Muniz v. State*, 851 S.W.2d 238, 253–54 (Tex. Crim. App. 1993). Any prediction about the future events is not a promise. *Mason v. State*, 116 S.W.3d 248, 261 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (involving an officer's statements that the situation would "go better" for appellant by giving a confession was a prediction about a future event that did not amount to a promise).

The only evidence in support of appellant's contention that the officer promised probation in exchange for a confession is the testimony of appellant's friend at the suppression hearing; the friend's testimony was controverted by that of the investigating officer. No other record evidence supports appellant's assertions, and no promises or statements regarding probation appear on the video recording of appellant's statement. In the October Statement, appellant made no reference to a promise for probation. The trial court chose to believe the officer's testimony that he did not make the alleged promise of probation to appellant or to appellant's friend, and we defer to this assessment of the facts. *See Miller v. State*, 312 S.W.3d 162, 168 (Tex. App.—Fort Worth 2010, no pet.) (deferring to the trial court's determination of credibility and demeanor and concluding that the trial court did not abuse its discretion by finding appellant's statement voluntary despite an alleged promise by the investigating officer).

Appellant cites *Pitts v. State*, 614 S.W.2d 142, 143 (Tex. Crim. App. [Panel Op.] 1981), as support for his argument that the officer's statements amounted to an improper inducement. But, unlike the promisor in *Pitts*, the officer interviewing appellant did not directly, positively, and unequivocally promise that appellant would not go to jail or that appellant would receive only probation. *See Ramirez*,

6

76 S.W.3d at 126–27. Rather, the record reflects that the officer informed appellant that most likely appellant would be indicted. Any indication that appellant would not go to jail or would receive probation does not rise to the same level of inducement as in *Pitts* and is not enough, standing alone, to induce a statement because the officer did not make a direct, positive offer in his single comment, "no," to the friend's inquiry as to whether appellant would go to jail or receive probation. *See Martinez*, 127 S.W.3d at 795 (concluding no positive promise was made when the officer left the impression that if appellant accepted responsibility, the officer would not file charges against others); *Humphries v. State*, 993 S.W.2d 826, 830 (Tex. App.—El Paso 1999, pet. ref'd) (concluding that an officer's statement that accused would be a witness and not a defendant if he was not involved in a murder but had information about the murder, did not induce a confession because the remarks did not amount to a direct, positive promise of a benefit and served as a comment on the status of the case). *See also Espinosa v. State*, 899 S.W.2d 359, 364 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd) (concluding that an officer's promise that appellant would receive "less time" if he confessed was not of such an influential nature that it caused appellant to confess). The trial court did not err in denying appellant's motion to suppress on these grounds. *See Martinez*, 127 S.W.3d at 795.

As for whether appellant could have been induced by the officer's comments that appellant could help himself by confessing or that the officer was attempting to help appellant, the officer's statements were not positive promises of leniency. *See Herrera v. State*, 194 S.W.3d 656, 660 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (holding that the statement, "We can talk to the D.A., get you an offer, if you can help us," was not specific enough to influence appellant to speak untruthfully); *Drake v. State*, 123 S.W.3d 596, 603 (Tex. App.—Houston [14th

7

Dist.] 2003, pet. ref'd) (concluding that an officer's general, non-specific statement that an appellant "could help herself" did not render appellant's statement involuntary). General promises of leniency, such as the officer's statement that an appellant's cooperation by giving a statement would "help" the accused do not reach the required level for improper inducement. *See Dykes*, 657 S.W.2d at 797. Moreover, the officer's remarks were not of such an influential nature as to amount to improper inducement. *See Johnson v. State*, 68 S.W.3d 644, 654 (Tex. Crim. App. 2002) (providing that officer's representation that an accused's cooperation would be conveyed to the trial court was not a promise inducing a confession).

The record does not reflect that appellant's will was overborne as a result of the officer's comments so as to render appellant's statements involuntary. *See Mason*, 116 S.W.3d at 261. The September Statements were admissible because they were given freely and voluntarily and are not invalidated under article 38.21. *See* Tex Code Crim. Proc. art. 38.21; *Drake*, 123 S.W.3d at 603 (holding that appellant's statements were freely and voluntarily given despite allegations of a promise and of improper inducement through an offer to help appellant). Because the September Statements are admissible, the October Statement, in which appellant referred to the September Statements, is not "fruit of the poisonous tree." Therefore, the trial court did not abuse its discretion by denying appellant's motion to suppress. *See Drake*, 123 S.W.3d at 603. We overrule appellant's first issue.

### REFUSAL TO ADMIT EXPERT TESTIMONY OF FORENSIC PSYCHIATRIST

In his second issue, appellant asserts that the trial court violated his constitutional right to present a meaningful defense when it erroneously ruled that Dr. Michael Fuller could not testify as to his expert opinion that appellant fits the profile of someone who would be susceptible to giving a false confession.[1] The

---

[1] The trial court ruled that Dr. Fuller was qualified as a forensic psychiatrist and could testify

8

erroneous exclusion of evidence offered under the rules of evidence generally constitutes non-constitutional error. *See Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007). But, constitutional error occurs when the trial court erroneously excludes otherwise relevant, reliable evidence which "forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002) (quoting *Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002)). Appellant argues that such constitutional error occurred when the trial court ruled that Dr. Fuller would not be allowed to testify before the jury about his expert opinion that appellant fits the profile of one who would be susceptible to giving a false confession.

We review a trial court's ruling on the admissibility of evidence under an abuse-of-discretion standard. *See Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010). Texas Rule of Evidence 702, entitled "Testimony by Experts," governs the admission of expert testimony, and provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

TEX. R. EVID. 702. In *Kelly v. State*, the Court of Criminal Appeals adopted several procedural and substantive limitations upon the admission of expert scientific testimony to ensure that unreliable expert opinions would be excluded from the jury's consideration. *See Kelly v. State*, 824 S.W.2d 568, 572–73 (Tex. Crim. App. 1992). Under *Kelly*, a trial judge, upon request, must conduct a

---

generally about circumstances in which false confessions could occur. But, the trial court ruled Dr. Fuller could not testify as to his expert opinion that appellant fits the profile of someone who would be susceptible to giving a false confession. On appeal, the parties do not dispute Dr. Fuller's qualifications as a forensic psychiatrist.

"gatekeeping" hearing outside the presence of the jury to determine whether scientific evidence is sufficiently reliable and relevant to help the jury in reaching an accurate result. *See Coble*, 330 S.W.3d at 273. Then the judge must decide whether, on balance, that expert testimony might nonetheless be unhelpful or distracting for other reasons. *See id.* To be considered reliable, evidence from a scientific theory must satisfy three criteria: "(a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question."[2] *Id.* (quoting *Kelly*, 824 S.W.3d at 573). The trial court's essential gatekeeping role is to ensure that evidence that is unreliable because it lacks a basis in sound scientific methodology is not admitted. *See id.*

For expert testimony to be admissible under this rule, the party offering scientific expert testimony must demonstrate, by clear and convincing evidence, that this testimony is sufficiently reliable and relevant to assist the factfinder in reaching accurate results. *See Kelly*, 824 S.W.2d at 572. When, as in the case under review, we are addressing fields of study such as the social sciences or fields that are based primarily upon experience and training as opposed to the scientific method, we apply the less rigorous standard set forth in the *Nenno* case. *See Coble*, 330 S.W.3d at 273–74 (applying *Nenno* test to testimony of forensic psychiatrist regarding future dangerousness); *Nenno v. State*, 970 S.W.2d 549,

---

[2] In *Kelly*, the Court of Criminal Appeals set out the following list of nonexclusive factors that a trial court can consider in determining scientific reliability: (1) the extent to which the underlying theory and technique are accepted as valid by the relevant scientific community; (2) the qualifications of the testifying expert; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential error rate; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person who applied the technique in this case. *Kelly*, 824 S.W.3d at 573. *See Coble*, 330 S.W.3d at 273, n.40.

560–61 (Tex. Crim. App. 1998), *overruled in part on other grounds by*, *State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999); *Ruckman v. State*, 109 S.W.3d 524, 5209–31 (Tex. App.—Tyler 2000, pet. ref'd) (applying *Nenno* test to testimony regarding false confessions). Under this standard, the trial court must inquire whether (1) the field of expertise is a legitimate one, (2) the subject matter of the expert's testimony is within the scope of the field, and (3) the expert's testimony properly relies upon or utilizes the principles involved in the field. *See Coble*, 330 S.W.3d at 273–74; *Nenno*, 970 S.W.2d at 561. This inquiry is somewhat more flexible than the application of the *Kelly* factors. *Coble*, 330 S.W.3d at 274. The general principles announced in *Kelly* apply, but the specific factors outlined in those cases may or may not apply depending upon the context. *See id*. Under either *Kelly* or *Nenno*, reliability should be evaluated by reference to the standards applicable to the particular professional field in question. *See id*.

The State objected that appellant had failed to satisfy the *Nenno* test, and the trial court ruled that Dr. Fuller could not testify as to his expert opinion that appellant fits the profile of one who would be susceptible to giving a false confession. Dr. Fuller testified at a hearing outside the presence of the jury so that the trial court could determine the admissibility of his testimony. Dr. Fuller stated that the area of false confessions was within the scope of his field of practice and area of expertise as a forensic psychiatrist. Dr. Fuller outlined three "sub sets [sic] of false confessions that are accepted in the literature and by researchers." He referred generally to 300 cases in the span of two decades in which the results of DNA testing had exonerated individuals convicted of a crime. Dr. Fuller stated that about fifteen to twenty-five percent of these individuals were found to have falsely confessed. According to Dr. Fuller, "false confessions frequently occur in individuals who are emotionally unstable, who have mental illness, [sic] who have

11

impaired cognitive abilities." Dr. Fuller expressed his belief that there is a "legitimate clinical concern" as to whether appellant falsely confessed to the charged offense. According to Dr. Fuller, this concern is a result of appellant's testimony that he falsely confessed and appellant's "psychological profile" which Dr. Fuller described as "one that is very much like the psychological profile of an individual who would be at relatively or higher risk than, say, the average person for making a false confession." According to Dr. Fuller, appellant's psychological profile is consistent with the profile of someone who would falsely confess.

On cross-examination by the State, Dr. Fuller acknowledged that he had never before testified in a court as an expert specifically in the area of false confessions. Dr. Fuller testified he had read reviews of articles by a "Dr. Leo" and reviews of articles by Mr. Saul Kassin. Dr. Fuller also read a 2009 article by Dr. Leo on the topic of false confessions as well as excerpts from the work of Mr. Kassin. Dr. Fuller indicated he found these articles by searching the internet for "false confessions" after evaluating appellant several months before trial. Dr. Fuller stated he had not read *The Psychology of Confessions* by Saul Kassin. Dr. Fuller acknowledged that he did not teach any courses in false confessions and had not written any articles or books on the topic. Dr. Fuller stated that this case is the first time he has "focused more directly and thoughtfully" on false confessions as a primary issue. Dr. Fuller testified that he based his conclusion that appellant had the profile of a person who would confess falsely on his general mental-status examination of appellant, his clinical interview, and his discussion with appellant of the circumstances at or near the time of the alleged crime. According to Dr. Fuller, he based this conclusion on his findings that appellant was suffering from a major depressive episode with extreme hopelessness about his future, a sense of failure in general about the quality and direction of appellant's life, obsession with military themes of honor and chivalry, and preoccupation with "the notion of

12

laying himself down as part of a tribe or as part of a group. . .” Dr. Fuller described appellant as a very needy, disturbed young man, who was depressed and hopeless but not psychotic, and probably intermittently intoxicated. According to Dr. Fuller, there is a possibility appellant made a voluntary, false confession to achieve notoriety, attention, and a disturbed sense of fame.

Dr. Fuller did not administer any formal psychological testing of appellant. The only examination he used with appellant was an examination for neurological function, cognitive function, and memory function. Dr. Fuller has heard of the “Johnson Suggestibility Scale,” but he has not used that scale and is unfamiliar with it. Dr. Fuller did not tie his opinion that appellant had the profile of a person who would confess falsely to any specific study or article. Nor did Dr. Fuller provide the trial court with a copy of any study or article. Dr. Fuller had not read an article by Kassin cited by the State. Dr. Fuller did not explain how his testimony properly relies upon or uses principles in this field, nor did he cite any article or other source in support of this proposition. There is no objective source material in this record to substantiate Dr. Fuller’s methodology as one that is appropriate in the practice of forensic psychiatry.

We presume, without deciding, that the field of Dr. Fuller’s expertise is a legitimate one, and that the subject matter of Dr. Fuller’s testimony is within the scope of the field. Nonetheless, based upon the lack of evidence showing that Dr. Fuller’s testimony properly relies upon or utilizes the principles involved in this field, we conclude that appellant did not satisfy his burden of showing by clear and convincing evidence during the gatekeeping hearing the reliability of Dr. Fuller’s methodology for determining whether appellant fits the profile of someone who would be susceptible to giving a false confession. *See Coble*, 330 S.W.3d at 279–80 (holding that proponent of expert testimony by forensic psychiatrist did not

13

show by clear and convincing evidence at the gatekeeping hearing that expert's methodology was reliable based upon third *Nenno* factor); *Ruckman*, 109 S.W.3d at 530 (holding that proponent of expert testimony regarding false confessions did not show by clear and convincing evidence at the gatekeeping hearing that expert's testimony was reliable based upon lack of proof regarding third *Nenno* factor). We conclude the trial court did not abuse its discretion by ruling that Dr. Fuller could not testify before the jury as to his expert opinion that appellant fits the profile of someone who would be susceptible to giving a false confession. *See Coble*, 330 S.W.3d at 277–80; *Ruckman*, 109 S.W.3d at 530. Because the trial court's exclusion of this evidence was not erroneous, it cannot constitute constitutional error as asserted by appellant in his second issue. *See Wiley*, 74 S.W.3d at 405. Accordingly, we overrule appellant's second issue.

The trial court's judgment is affirmed.


/s/     Kem Thompson Frost
         Chief Justice


Panel consists of Chief Justice Frost and Justices Donovan and Brown.[3]
Publish — Tex. R. App. P. 47.2(b).

---

[3] Originally, this case was submitted before a panel consisting of Justices Frost, Jeffrey Brown, and Donovan. Following the appointment of Justice Jeffrey Brown to the Supreme Court of Texas and the appointment of Justice Frost as Chief Justice of the Fourteenth Court of Appeals, this case was resubmitted to the current panel of Chief Justice Frost, Justice Donovan, and Justice Marc Brown.